# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS GRAJEDA,<br><br>     Petitioner,<br><br>v.<br><br>RICHARD KIRKLAND,<br><br>     Respondent. | 1:06-cv-01709-JMD-HC<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS WITH PREJUDICE<br><br>ORDER DIRECTING CLERK TO ENTER JUDGMENT<br><br>ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY<br><br>ORDER DISCHARGING PRODUCTION ORDER (DOC. 19 )<br><br>ORDER DENYING RESPONDENT'S REQUEST FOR RELENT AND RECONSIDERATION (DOC. 23) AS MOOT |

Petitioner Thomas Grajeda ("Petitioner") is proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## **Procedural History**

On December 14, 2003, Petitioner was convicted of three counts of solicitation of murder. (Pet. at 2).  The Superior Court sentenced Petitioner to three consecutive terms of 25 years to life. (Id.).

Petitioner filed an appeal in the California Court of Appeal on April 26, 2004. (Pet. at 3). The California Court of Appeal affirmed Petitioner's conviction in a reasoned decision issued on November 4, 2004.  (Pet., Ex. A).

1   In December 2004, Petitioner filed a petition for review in the California Supreme Court.

2   (Pet., Ex. B).  The California Supreme Court denied the petition for review on January 12, 2005.

3   On March 28, 2006, Petitioner filed a petition for writ of habeas corpus in the California

4   Supreme Court.  (Pet., Ex. C).  (Id.).  The California Supreme Court summarily denied Petitioner's

5   state habeas petition on November 15, 2006.  (Pet., Ex. D).

6   Petitioner filed the instant petition for writ of habeas corpus in the United States District

7   Court, Eastern District of California on November 27, 2006.  (Doc. 1).  Respondent filed an answer

8   to the petition on February 20, 2008.  (Doc. 7).  Respondent consented to have a United States

9   Magistrate Judge conduct all proceedings in this case pursuant to 28 U.S.C. § 636(c)(1) on February

10  20, 2008. (Doc. 8).  Petitioner consented to Magistrate Jurisdiction on March 6, 2008.  (Doc. 10).

11  **Factual Background**

12  On December 2, 2002, an information filed against Petitioner alleged that "on or about March

13  30, 2001, said defendant, Thomas Grajeda, did ...willfully, unlawfully, and with the intent that the

14  crime be committed solicit...Jamie Rosas Munoz...to commit and join in the commission of the

15  murder of Steven Ray Gonzalez." (Pet. at 2; Lod. Doc. 3, Trans. Vol 8 at 706).  A separate

16  information alleged:

17  Count I, on or about the time interval beginning on August 15, 2001, and ending
    November 30, 2001, inclusive, said defendant, Thomas Grajeda, did...willfully,
18  unlawfully, and with the intent that the crime be committed solicit another...Danny
    Figueroa to commit and join in the commission of the murder of Alfredo Martinzes
19  Jr., aka Yogi, a human being. ¶ Count II, on or about the time interval beginning on
    August 15, 2001 and ending on August 30, 2001, inclusive, said Defendant, Thomas
20  Grajeda, did...willfully, unlawfully, and with the intent that the crime be committed
    solicit another...Danny Figueroa, to commit and join in the commission of the murder
21  of Ray Martinez, aka Veneno, a human being.

22
23  (Id.)  On January 14, 2003, the trial court granted a prosecution motion to consolidate the trials on

24  Petitioner's two cases, and a jury subsequently convicted Petitioner of three counts of solicitation of

25  murder in violation of California Penal Code section 653f(b).[1]

26  ///

27  _____

28  [1] Section 653f(b) provides: "Every person who, with the intent that the crime be committed, solicits another to commit or join
    in the commission of murder shall be punished by imprisonment in the state prison for three, six, or nine years." CAL. PEN.
    CODE § 653f(b) (Deering's 2008)

Petitioner appealed his conviction, asserting two claims of error relevant to the instant petition: 1) the trial court erred in denying Petitioner's discovery motion, ("Pitchess motion")[2] and; 2) the trial court erred in excluding the testimony attacking the credibility and character of a key prosecution witness. (Id.)

**The Pitches Motion**

On December 21, 2002, defendant filed a motion in connection with Kings County Superior Court case No. 02CM7329 2 for pretrial discovery of the personnel records of two correctional officers, John Montgomery and Russell Roper. These officers eventually testified for the People at defendant's trial. Defense counsel filed points and authorities and a declaration in support of this motion. However, the declaration is incorrectly captioned as being in support of a motion for separate trials and it incorrectly states that counsel is representing a person named Jose DeJesus Placentia. In this declaration, defense counsel averred that "arrestees" and others may complain to "said agency concerning its law enforcement officers" about "acts of unnecessary or excessive force, acts demonstrating racial or ethnic prejudice, acts of illegal arrest and improper search and seizure, and acts of dishonesty." The personnel records may contain records of disciplinary proceedings convened as a result of these complaints. Defense counsel averred that the personnel records are relevant because "the defense expects to show that the officers involved are subject to staff misconduct and illegal activities including creating 'false kites' - small notes prisoners pass from cell to cell and enact punitive measure supposedly justified by the kites. Officers of IGI [Institutional Gang Investigations] use coercion and threats to force confession and other testimony from alleged gang members and are retaliate [sic] against inmates for filing 602 appeals."

The officers opposed the discovery motion. In written opposition, their counsel argued, "discovery is not sought to support [a] defense, but rather [is] an attempt to find a defense. Defendant has also failed to state a valid theory of admissibility."

Argument was held on December 13, 2002. Defense counsel stated that he was seeking information about other complaints involving false kites, as well as coercion and threats of force. Counsel for the officers responded that defense counsel's declaration failed to meet the threshold requirement of showing good cause. The trial court denied the motion without prejudice, finding defense counsel's declaration "insufficient to support the motion."

(Pet. Ex. A at 4-6)[3].

///

///

---

[2] Under California law, "a criminal defendant, on a showing of good cause, is entitled to discovery of information in the confidential personnel records of a peace officer when that information is relevant to defend against a criminal charge." E.g., People v. Gaines, 46 Cal.4t h 172, 176 (Cal. 2009) (citing CAL. PEN. CODE, § 832.7; CAL. EVID. CODE, § 1043 et seq.; and Pitchess v. Superior Court, 11 Cal.3d 531(Cal. 1974)).

[3] The Court adopts the California Court of Appeal's summary of the facts relevant to the instant petition.

On appeal, Petitioner challenged the Superior Court's denial of the Pitchess motion. The California Court of Appeal held that because Petitioner failed to demonstrate good cause for obtaining the witnesses' personnel records, the Superior Court did not abuse its discretion. The Court of Appeal stated:

> The applicable statutes establish a two-step procedure. As relevant here, the moving party must file a written motion that is supported by affidavits showing "good cause" in two general categories: (1) the "materiality" of the records to the "subject matter involved in the pending litigation," and (2) a "reasonable belief that the governmental agency identified has the records or information from the records." If good cause is established, the trial court conducts an in-chambers examination of the records to determine whether they are relevant. It shall exclude from disclosure several enumerated categories of information...
>
> Defendant contends that the trial court applied an unfairly heightened threshold for determining whether the materiality prong of the good cause requirement had been satisfied. We disagree. The record fully supports the trial court's conclusion that defense counsel's declaration was insufficient.
>
> Even under the least demanding interpretation of the materiality prong of the good cause element, defendant failed to meet his evidentiary burden. A recent Supreme Court opinion addressing this requirement states, "a defendant seeking Pitchess disclosure must, under statutory law, make a threshold showing of 'materiality.' Under Pitchess, a defendant need only show that the information sought is material 'to the subject matter involved in the pending litigation.'" This threshold showing is characterized as "'relatively low.'" Here, defendant did not meet this minimally demanding standard. Although defendant's appellate counsel successfully articulates a coherent theory under which personnel records documenting prior complaints of misconduct related to fabrication of kites or coercion of false testimony from inmates could be found material, defendant's trial counsel failed to do so. Defense counsel's declaration appears to be a boilerplate document. The declaration is not captioned correctly and it misidentified the defendant. It does not specify the defenses that possibly could be bolstered by the personnel records. It did not establish a factual nexus between Montgomery and Roper on the one hand and Figueroa or defendant on the other. It does not specifically aver on information and belief that defendant did not write the kites at issue or that Figueroa is lying. The reference to "602 appeals" in the declaration is unintelligible and the averment concerning "acts of unnecessary or excessive force, acts demonstrating racial or ethnic prejudice, acts of illegal arrest and improper search and seizure" do not have any application here. The solitary reference to kites in the declaration is insufficient to establish the relevance of the officers' personnel records to an applicable defense. Furthermore, defendant did not tailor his discovery request to specific types of officer misconduct. The declaration listed numerous categories of misconduct, such as excessive force, illegal arrest and acts demonstrating racial prejudice, which have no apparent applicability to this case. Thus, the request is overbroad.
>
> In sum, the discovery motion at issue here appears to be the very type of "fishing expedition" against which Pitchess warned. Defense counsel's argument at the hearing could not rectify the evidentiary deficiencies because such argument is not evidence. Since defendant failed to show good cause for the requested discovery, denial of the motion was not an abuse of discretion. Defendant's constitutional rights were not infringed.

1   (Pet. Ex. A at 12-13) (citations omitted).

2   **Trial Testimony**

3        Petitioner's conviction offenses occurred at Corcoran State Prison.  The prosecution called

4   Corcoran inmate Daniel Figueroa as its first witness.  Figueroa testified that he was once an associate

5   of the Mexican mafia. ( Lod. Doc. 3, Trans. Vol 8 at 743).  Figueroa distinguished between Mexican

6   mafia associates, such as himself, who were required to take orders, and members, who had the

7   authority to give orders. (Id. at 750).  Figueroa testified that he had known Petitioner for

8   approximately eleven years and that Petitioner was a member of the Mexican mafia. (Id. at 766-67).

9        According to Figueroa's testimony, Ray Martinez, also known as "Veneno," and Alfredo

10  Martinez, also known as "Yogi," assaulted an inmate named Jamie Munoz, who was a friend of

11  Petitioner's.  (Id. at 779-781).  Figueroa testified that Petitioner "disagreed" with the assault carried

12  out on Munoz and asked Figueroa to kill Alfredo Martinez and Ray Martinez in notes referred to as

13  "kites" passed from Petitioner's cell to Figueroa's cell. (Id. at 782).  Figueroa testified further that

14  Petitioner orally confirmed the orders to kill Alfredo Martinez and Ray Martinez in person while

15  Figueroa and Petitioner were in adjacent exercise modules in the prison's recreation yard. (Id.).

16       During the trial, the prosecution entered several kites into evidence that Figueroa testified

17  were sent to him by Petitioner. (Lod. Doc. 3, Trans. Vol  9 at 1004-18).  Figueroa testified that he

18  knew the kites had been sent to him by Petitioner because they were sealed, signed with Petitioner's

19  moniker, "Wino," and because Figueroa recognized Petitioner's handwriting.  (Id.).  With respect to

20  several unsigned kites, Figueroa testified that he believed them to be from Petitioner because he

21  recognized Petitioner's handwriting. (Id.).  Figueroa testified that he turned over several kites to

22  Correctional Officer Roper in connection with Figueroa's attempt to cooperate with prison officials

23  and disassociate himself from the Mexican mafia. (Lod. Doc. 3, Trans. Vol 8 at 766).

24       Prosecution witness Dean Bowen, a registered nurse employed at Corcoran State Prison,

25  testified that he helped treat Jamie Munoz after Munoz was assaulted on March 30, 2001.  (Lod.

26  Doc. 3, Trans. Vol 9 at 1196-1198).  Bowen testified that while preparing Munoz for surgery, other

27  medical staff remove two kites and a several small metal fragments from Munoz's mouth and placed

28  them in Bowen's hand. (Id. at 1199-1200).  Prosecution witness Gustavo Cruz, a correctional officer

employed at Corcoran State Prison during 2001, testified that he responded to the Acute Care Hospital at Corcoran at approximately 10:45 am on March 20, 2001 and retrieved a razor and two small kites from nurse Bowen. (Lod. Doc. 3, Trans. Vol 10 at 1304).   Cruz testified that he subsequently turned the items over to Correctional Officer Lori Carrell, an evidence officer at Corcoran.  (Id. at 1305).  Carrell testified that after documenting and photographing the objects given to her by Officer Cruz, she took the documents given to her by Officer Cruz, as well as several other documents given to her by Correctional Officer Roper, to the Department of Justice for analysis.  (Id. at 1314-1332).  Prosecution witness Russell Roper, a member of Corcoran's Institutional Gang Investigative Unit, testified regarding the kites produced by Figueroa as well as handwriting samples taken from Petitioner's cell, including an "Inmate Request for Interview Form" that Officer Roper personally retrieved from Petitioner's cell.  (Id. at 1362-1365).

Joseph Merydith, a forensic document examiner with the California Department of Justice, testified as a qualified expert witness. (Id. at 1391).  Merydith testified that, based on his analysis of Petitioner's known handwriting samples, only Petitioner could have authored the kites Figueroa turned over to Officer Roper. ( Lod. Doc. 3, Trans. Vol 10 at 1397-98; 1403-06).  Merydith also testified that in his opinion, only Petitioner could have written the kite found in Munoz's mouth that appeared to order the killing of Steven Gonzales. (Id. at 1407-08).

The prosecution also called Sergeant John Montgomery, a Correctional Officer at Corcoran State Prison, to testify as an expert on the Mexican mafia.  Montgomery testified that the signature on several of the kites allegedly sent by Petitioner to Figueroa indicated that the person who sent the kites was a member of the Mexican mafia.  (Id. at 1438).  Montgomery based his conclusion on the fact that the "i" in the name "Wino" contained an "m" in the circle dotting the "i,"  which indicates membership in the Mexican mafia. (Id.)  Montgomery further testified that he believed "Wino" to be the Petitioner, and that the note found in Munoz's mouth was an order to kill Steven Gonzales.  (Id.).

The defense called Jamie Munoz as its first witness.  Munoz testified that he authored exhibit 69-C, one of the kites that was found in Munoz's mouth on March 30, 2001.  (Id. at 1470).  Munoz testified that he forged the kite in Petitioner's handwriting due to animosity he felt towards Petitioner.  (Id.).  Munoz testified that no one ever ordered him to commit murder. (Id. at 1476).

Alfredo Martinez testified, for the defense, that in his personal opinion, prosecution witness Daniel Figueroa was a liar.  (Id. at 1496).  Petitioner's brother, Daniel Grajeda, also testified as Defense witness and stated that Figueroa was known in the prison system as "Bullshit Smokey" and that Grajeda would question anything that Figueroa said.  (Lod. Doc. 3, Trans. Vol 11 at 1678-79).

Defense witness Fernando Bermudez was called to testify regarding Figueroa's reputation in the prison community as a forger of documents. (Id. at 1668).  The prosecutor objected on grounds of relevancy and lack of foundation, and the court sustained the objection.  The California Court of Appeal summarized the defense's ensuing offer of proof:

> in an offer of proof outside the jury's presence, defense counsel stated that he was trying to present evidence that Figueroa had forged the kites.  Bermudez testified that he personally did not know Figueroa but he was aware of "his ability as an artist." Figueroa was able to do "different writings, documents," including "kites, for instance." Bermudez testified that "it's pretty well known throughout the system" that Figueroa "is a good forger." Bermudez thinks that "probably about three dudes" told him that defendant "can do that kind of stuff right there." The trial court excluded this testimony because "it is hearsay and inadmissible opinion and conclusion."

(Pet. Ex. A at 12-13).  Petitioner challenged the Superior Court's exclusion of Bermudez's testimony on appeal.  The Court of Appeal rejected Petitioner's challenge:

> Defendant contends that Bermudez's testimony about Figueroa's reputation as a skilled forger was admissible under the exception to the hearsay rule permitting "evidence of a person's general reputation with reference to his character or a trait of his character at a relevant time in the community in which he then resided or in a group within which he then habitually associated." (Evid. Code, § 1324.) Defendant also cites Evidence Code section 1100, which states: "Except as otherwise provided by statute, any otherwise admissible evidence (including evidence in the form of an opinion, evidence of reputation, and evidence of specific instances of such person's conduct) is admissible to prove a person's character or a trait of his character."
>
> The Attorney General replies that the proffered testimony is not encompassed within the hearsay exception for reputation evidence because forgery is an acquired skill and is not a character trait. We find this argument persuasive. Character evidence relates to recognized human qualities or traits such as truthfulness, honesty, integrity, peacefulness and composure. (See, e.g., People v. Cobb (1955) 45 Cal.2d 158, 163.) Forgery is a specific type of artistic skill, not a character trait. Being a forger can be a profession or an avocation, albeit an illegal one. In this sense, it is no different than being an engineer, a musician or a physician. One does not have a reputation as a piano teacher or a dentist; one either possesses the skills necessary to perform this function or one does not. Similarly, one either possesses the abilities necessary to forge documents or one does not.
>
> Although it does not appear that published California authority has specifically addressed this point (perhaps because it is so obvious), sister jurisdictions fully support the Attorney General's position. Appellate courts in other states have

explained that character evidence means testimony about commonly recognized human qualities or traits. Specific acts may reflect character traits but describing those acts is not the same thing as giving character evidence. (Brown v. State (Wyo. 1998) 953 P.2d 1170, 1176; State v. Marshall (Or. 1991) 312 Ore. 367, 823 P.2d 961, 963-964.) The Attorney General properly cites a case authored by the West Virginia Supreme Court of Appeals holding that one's reputation for selling or not selling drugs does not relate to a character trait. (State v. Marrs (W.Va. 1989) 180 W. Va. 693, 379 S.E.2d 497, 500-501.) The respected treatise Wigmore on Evidence is similarly supportive. When discussing reputation evidence to prove character, it concisely explains that the "species of character of which reputation [*16] is strictly and properly a trustworthy evidence is moral character, i.e., traits of permanent moral constitution, such as peaceableness, honesty, veracity, and the like, or their opposites." (5 Wigmore, Evidence (Chadbourn rev. 1974) § 1620, p. 598.)

Defendant responds that being a forger necessarily implies certain negative character traits such as dishonesty and therefore the contested testimony should have been admitted on this basis. This response is unpersuasive because defendant did not argue at trial that testimony showing that Figueroa is reputed to be a forger should be admitted to prove that Figueroa was dishonest. Rather, defense counsel explicitly stated that testimony on this topic was relevant to prove that Figueroa forged the kites that he gave to correctional officers. Moreover, several other witnesses testified that Figueroa was dishonest; further testimony on this point would have been cumulative.

Defendant also replies that a witness's credibility can be attacked by any relevant evidence, regardless whether it is in the form of an opinion, reputation or specific acts of conduct. We agree with this general proposition. However, credibility must be attacked with competent, admissible evidence. Hearsay evidence is inadmissible unless an exception applies. (Evid. Code, § 1200, subd. (b).) Bermudez did not know Figueroa and never saw him forge any documents. Bermudez's testimony that other people told him that Figueroa is a forger is hearsay because it is premised on third parties' out of court statements and it was offered to prove the truth of the matter stated. (Evid. Code, § 1200, subd. (a).) Inadmissible hearsay evidence cannot be used to attack a witness's credibility any more than it can be used for any other purpose.

(Pet. Ex. A at 14-16).

## Discussion

## I.    Jurisdiction and Venue

A person in custody pursuant to the judgment of a state court may file a petition for a writ of habeas corpus in the United States district courts if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a);[4] 28 U.S.C. § 2241(c)(3); Williams v.

---

[4] The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

1  _Taylor_, 529 U.S. 362, 375, n.7 (2000).  Venue for a habeas corpus petition is proper in the judicial

2  district where the prisoner is held in custody.  _See_ 28 U.S.C. § 2241(d).

3        Petitioner is currently incarcerated at Corcoran State Prison in Kings County, California.

4  As Petitioner asserts that he is being held in violation of his right to due process under the United

5  States Constitution, and because Kings County is within the Eastern District of California, the Court

6  has jurisdiction to entertain Petitioner's petition and venue is proper in the Eastern District.  28

7  U.S.C. § 84; 28 U.S.C. § 2241(c)(3).

8  **II.    AEDPA Review**

9        Section 2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody

10 pursuant to a state court judgment."  _Sass v. California Board of Prison Terms_, 461 F.3d 1123, 1126

11 (9th Cir. 2006) (quoting _White  v. Lambert_, 370 F.3d 1002, 1009-10 (9th Cir. 2004)).  A petition for

12 habeas corpus pursuant to section 2254 may not be granted unless the state court decision

13 adjudicating the relevant claim or claims "was contrary to, or involved an unreasonable application

14 of, clearly established Federal law, as determined by the Supreme Court of the United States," or

15 "was based on an unreasonable determination of the facts in light of the evidence presented in the

16 State court proceeding." 28 U.S.C. § 2254(d).  "A federal habeas court may not issue the writ simply

17 because that court concludes in its independent judgment that the relevant state-court decision

18 applied clearly established federal law erroneously or incorrectly...rather, that application must be

19 objectively unreasonable."  _Lockyer v. Andrade_,538 U.S. 63, 75 (2003) (citations omitted).  Where a

20 state court provides no rationale for its decision to deny a prisoner's claim, a federal habeas court

21 must determine whether the state court's decision was "objectively unreasonable" based on its

22 independent reading of the record.  _Brazzel v. Washington_, 491 F.3d 976, 981 (9th Cir. 2007)

23 (quoting _Pirtle v. Morgan_, 313 F.3d 1160, 1167 (9th Cir. 2002)); _Delgado v. Lewis_, 223 F.3d 976,

24 982 (9th Cir. 2000), _overruled on other grounds by_ _Lockyer_, 538 U.S. at 75-76; _see also_ _Himes v._

25 _Thompson_, 336 F.3d 848, 853 (9th Cir. 2003).

26       **A. Timeliness**

27       Respondent contends that the instant petition is untimely because its was filed more than a

28 year after Petitioner's conviction became final.  (Answer at 6.).  However, the statute of limitations

U.S. District Court
E. D. California

9

1    for federal habeas actions is tolled during the time in which a petitioner's timely state habeas petition

2    is being decided.  See, e.g., Pace v. DiGuglielmo, 544 U.S. 408, 415-15 (2005).  Acknowledging

3    this point of law, Respondent concedes that the petition is timely if Petitioner's state habeas petition

4    was filed "without an unjustified substantial delay," which is the timeliness standard for habeas

5    actions under California law.  See In re Robbins, 18 Cal.4th 770, 787 (Cal. 1998).

6    　　　Given the nature of Petitioner's claims, which include a claim of ineffective assistance of

7    appellate counsel, the Court finds that Petitioner's delay in filing his state habeas petition was not

8    unjustified.  As set forth in Petitioner's state habeas petition, Petitioner retained new counsel to assist

9    him in preparation of his habeas petition, and after reviewing the voluminous record of Petitioner's

10   conviction and appellate proceedings, Petitioner's new counsel immediately prepared the state

11   habeas petition.  (Answer at 7).  Accordingly, the Court finds that the instant petition is not untimely.

12   　　　**B. Exhaustion**

13   　　　An application for a writ of habeas corpus on behalf of a person in custody pursuant to the

14   judgment of a state court shall not be granted unless it appears that the applicant has exhausted the

15   remedies available in the courts of the state.  28 U.S.C. § 2254(b)(1)(A).  However, a petition may be

16   denied on the merits notwithstanding the failure of the petitioner to exhaust his state remedies.  28

17   U.S.C. § 2254(b)(2).  Because the Court finds that each of Petitioner's claims should be denied on

18   the merits, the Court need not determine whether each of Petitioner's claims was properly exhausted.

19   See id.

20   **III.    Production Order**

21   　　　On April 8, 2009, the Court ordered Respondent to produce the records subject to Petitioner's

22   Pitchess motion, under seal, in order to assist the Court in resolving Petitioner's ineffective

23   assistance of counsel claim.  As of May 12, 2009, Respondent had not produced the records

24   requested by the Court and had not apprised the Court of Respondent's efforts to comply.

25   Accordingly, the Court issued a supplemental order requiring Respondent to either comply with the

26   production order by May 26, 2009, or face the possibility of appropriate sanctions.

27   The Court did not issue an order to show cause, opting instead to provide Respondent with an

28   additional two weeks to effect compliance with the Court's order.

U.S. District Court
E. D. California

1    Respondent filed a reply to the Court's supplemental order on May 13, 2009 ("reply").  The

2    Court construed Respondent's reply as an untimely objection to the Court's April 8 production order,

3    as the reply asked the Court to discharge the April 8 production order based on Respondent's

4    assertion that the Court's production order was contrary to law.[5]  On May 19, 2009, the Court issued

5    an order denying Respondent's objection to the Court's production order and ordering Respondent to

6    either comply with the order by May 26, 2009 or show cause for failure to comply ("OSC").  In

7    response to the OSC, Respondent filed a "Request for Relent, Reconsideration, and Response to

8    Order to Show Cause" on May 26 ("response").

9            **A. Respondent's Compliance with the Production Order**

10           Respondent's response to the OSC reveals that the Attorney General first commenced its

11   effort to comply with the Court's April 8 production order on April 23, 2009. (Response, Ex. A).  On

12   April 24, 2009, the Attorney General initiated contact with Corcoran State Prison, the entity most

13   likely to have been in possession of the records subject to the Court's production order.  (Response,

14   Ex. B).  On April 27, 2009, an official from Corcoran State Prison informed the Attorney General

15   that the records were likely no longer located at Corcoran State Prison. (Response, Ex. B).  It appears

16   that no further communication between the Attorney General's office and Corcoran State prison

17   occurred until after the Court issued the OSC on May 19.

18           On May 20, 2009, the day after the Court issued the OSC, the Attorney General contacted

19   Corcoran State Prison and obtained the information necessary to locate the records subject to the

20   production order. (Response, Ex. C).  The Attorney General then contacted the relevant custodians of

21   record and learned that the records ordered produced do not exist.  (Response, Ex. C; D; E ).

22   _____

23   [5] In its response to the Court's OSC, Respondent highlights the distinction between the terms "discharge" and "vacate" as
     they pertain to court orders, stating "'discharge' does not require a finding of invalidity in the making of an order; rather it
24   suffices that the order served its purpose and the obligations thereunder have been satisfied to the ability of the ordered
     person." (Response at 4, n.3) (citations omitted). Respondent advances this distinction despite the fact that the request for
25   "discharge" was based on Respondent's contentions that: 1) "there was...no good cause for this Court's two orders directing
     production," and 2) AEDPA bars the Court from considering the records ordered produced. (Id. at 4). Respondent's request
26   for discharge could not, in good faith, have been based on the Attorney General's assertion of factual impossibility, as the
     Attorney General had not yet identified the appropriate custodian of records for each of the officers' personnel files at the
27   time Respondent filed its response to the OSC. (Response, Ex. A).  As indicated in the OSC, representing to the Court that
     it is impossible to comply with a Court order, without first conducting an inquiry reasonable under the circumstances to
28   support such an assertion, is not appropriate. (OSC at 2, n.2).  Accordingly, Respondent's request for discharge is best
     characterized as a legal objection to the Court's production order, albeit an untimely one.

1    The Court finds that Respondent, through the Attorney General, has now attempted to

2    comply with the production order in good faith through the exercise of reasonable diligence.[6]

3    Respondent has show good cause for failure to produce the materials subject to the production order,

4    as the record now demonstrates that the documents do not exist.  (Response, Ex. C; D; E ).

5    Accordingly, the Court discharges the production order on the basis that compliance is precluded by

6    factual impossibility.

7    **B. Respondent's Request for Relent and Reconsideration**

8    Respondent's requests for relent and reconsideration are now moot, as the production order

9    is discharged and the petition denied with prejudice herein.[7]

10   **IV.    Petitioner's Claims**

11   **A. The Trial Court's Denial of Petitioner's Pitchess Motion**

12   Petitioner contends that the trial court's denial of his Pitchess motion deprived him of his

13   Sixth and Fourteenth Amendment right to confrontation as well as his due process right to a fair trial

14   under the Fifth and Fourteenth Amendments.  Petitioner also contends that his trial and appellate

15   counsel were ineffective for failing to appropriately pursue Petitioner's Pitchess claims.  As no

16   reasoned state court decision addresses Petitioner's constitutional claims, the Court must conduct an

17   independent review of the record and determine whether the California Supreme Court's summary

18   denial of Petitioner's claims was objectively unreasonable.  See, e.g., Musladin v. Lamarque, 555

19   F.3d 830, 835 (9th Cir. 2009).

20   ///

21

22   [6]  The reply filed by Respondent on May 26, 2009 does not explain why it took the Attorney General until the end of May
to finally effect a sufficient response to the Court's production order.  The Attorney General was able to obtain declarations

23   attesting to the non-existence of the documents ordered produced within a few days of the issuance of the OSC.  Had the
Attorney General exercised similar diligence in early April when the production order was entered, the Court would not have

24   had to issue the supplemental order or the OSC.

25   [7]  Respondent asks the Court to reconsider and vacate "recitals" contained in the OSC with respect to what Respondent and
the Attorney General "did or did not do in attempting to locate the Pitchess records." (Response at 7).  Respondent contends

26   that "it is unfair to Respondent and the Attorney General that such public castigation issued." (Id.). The Court cannot divine
the actions of Respondent and its counsel.  To the extent Respondent and its counsel were subjected to public castigation,

27   responsibility for receiving such criticism falls squarely on the shoulders of the Attorney General, who failed to accurately
inform the Court of the efforts made by Respondent and its counsel.  The Court need not reconsider or vacate statements

28   contained in the OSC, as the instant order is sufficient to establish for the record the Court's assessment of Respondent's
efforts to comply with the Court's production order.

1          **1. Confrontation Clause Claim**

2          The Sixth Amendment's Confrontation Clause is applicable to the states through the Due

3   Process Clause of the Fourteenth Amendment.  Hernandez v. Small, 282 F.3d 1132, 1137 n.3 (9th

4   Cir. 2002) (citation omitted).  The Confrontation Clause of the Sixth Amendment guarantees a

5   criminal defendant the right to be confronted with the witnesses against him.  E.g., Slovik v. Yates,

6   545 F.3d 1181, 1185-86 (9th Cir. 2009) (citation omitted).  "The Supreme Court has explained that

7   the right of confrontation 'means more than being allowed to confront the witness physically,' but

8   rather '[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity

9   of cross-examination.'"  Id.  "The right to confrontation is a trial right, designed to prevent improper

10  restrictions on the types of questions that defense counsel may ask during cross-examination."

11  Pennsylvania v. Ritchie, 480 U.S. 39, 53-54 (1987).  "The ability to question adverse witnesses,

12  however, does not include the power to require the pretrial disclosure of any and all information that

13  might be useful in contradicting unfavorable testimony."  Id. at 54.

14         Petitioner contends that the trial court's denial of his Pitchess motion denied him the

15  opportunity to confront officers Roper and Montgomery.  Petitioner's argument does not appear to

16  implicate the Confrontation Clause, as Petitioner's counsel remained free to question officers Roper

17  and Montgomery as to whether they had manufactured false kites or engaged in other relevant

18  misconduct.  See Id.  Petitioner's claim is virtually indistinguishable from the Confrontation Clause

19  claim rejected in Ritchie:

20              Ritchie claims that by denying him access to the information necessary to prepare his
                defense, the trial court interfered with his right of cross-examination...¶Ritchie argues
21              that he could not effectively question his daughter because, without the CYS material,
                he did not know which types of questions would best expose the weaknesses in her
22              testimony. Had the files been disclosed, Ritchie argues that he might have been able
                to show that the daughter made statements  to the CYS counselor that were
23              inconsistent with her trial statements...Ritchie argues that the failure to disclose
                information that might have made cross-examination more effective undermines the
24              Confrontation Clause's purpose of increasing the accuracy of the truth-finding process
                at trial...¶ If we were to accept this broad interpretation of [the Confrontation Clause],
25              the effect would be to transform the Confrontation Clause into a constitutionally
                compelled rule of pretrial discovery. Nothing in the case law supports such a view.
26              The opinions of this Court show that the right to confrontation is a trial right,
                designed to prevent improper restrictions on the types of questions that defense
27              counsel may ask during cross-examination.

28  Id. at 51-52.  Further, any right to pretrial discovery conferred by the Confrontation Clause was not

1   clearly established federal law as established by precedent of the United States Supreme Court at the

2   time the California Supreme Court denied Petitioner's state habeas petition.  See United States v.

3   Collins, 551 F.3d 914, 926 (9th Cir. 2009) ("Collins...argues that suppression of the tape violated his

4   Sixth Amendment right of confrontation because he was unable to use the suppressed recording to

5   impeach [witnesses against him]...¶ However, it is not clear that Collins' contention is the law")

6   (citing Ritchie, 480 U.S. at 52).  Accordingly, the California Supreme Court's denial of Petitioner's

7   Confrontation Clause claim was not objectively unreasonable.

8                              **2. Compulsory Process Clause Claim**

9            Although the applicability of the Compulsory Process Clause to discovery matters is

10  "unsettled...compulsory process provides no *greater* protections in [the area of pretrial discovery]

11  than those afforded by due process."  Ritchie, 480 U.S. at 57 (emphasis in original).  A defendant's

12  right to compulsory process is subject to the state's laws of evidence.  See, e.g., United States v.

13  Scheffer, 523 U.S. 303, 418-19 (1998); Moses v. Payne, 543 F.3d 1090, 1101-02 (9th Cir. 2008) ("a

14  defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable

15  restrictions, such as evidentiary and procedural rules"); Jordan v. DuCharme, 983 F.2d 933, 938 (9th

16  Cir. 1993) (exclusion of evidence on grounds of relevancy did not violate defendant's right to

17  compulsory process).  The States have "broad latitude under the Constitution to establish rules

18  excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a

19  defense so long as they are not 'arbitrary' or 'disproportionate' to the purposes they are designed to

20  serve."  Scheffer, 523 U.S. at 418-19.  California Evidence Code section 1043 and 1045 place

21  reasonable restrictions on a defendant's right to compulsory process.  See Harrison v. Lockyer, 316

22  F.3d 1063, 1065-66 (9th Cir. 2003) (holding that section 1043 complies with Brady v. Maryland, 372

23  U.S. 83 (1963) as modified by Ritchie for purpose of due process analysis).  Petitioner failed to make

24  the showing required by section 1043, which sets forth a standard that is "relatively low" and is less

25  onerous than the standard imposed by Brady.[8]  City of Los Angeles v. Superior Court, 52 P.3d 129,

26

27  ───────────────
    [8] Whether Petitioner made the required showing to meet section 1043's materiality requirement is a question of state law and
    is not cognizable in a federal habeas petition. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province
28  of a federal habeas court to reexamine state-court determinations on state-law questions").

1  134 (Cal. 2002); see also Harrison, 316 F.3d at 1065-66.

2       Petitioner has failed to meet his burden of establishing that California Evidence Code section

3  1043 is "arbitrary" or "disproportionate" to the purpose it is designed to serve.  As the California

4  Supreme Court noted in City of Santa Cruz v. Mun. Court, 776 P.2d 222, 234-35 (Cal. 1989), section

5  1043 "strikes a fair and workable balance between the need of criminal defendants for 'all relevant

6  and readily accessible information' … and the legitimate concerns of peace officers to shield from

7  disclosure confidential information not essential to an effective defense or otherwise obtainable from

8  other nonprivileged sources," see also Harrison, 316 F.3d at 1065-66 (approving of section 1043 in

9  due process context).  Further, Petitioner's allegations do not state a violation of clearly established

10  federal law as set forth by the precedent of the Supreme Court of the United States.  See Ritchie, 480

11  U.S. at 56 ("This Court has never squarely held that the Compulsory Process Clause ...require[s] the

12  government to produce exculpatory evidence...[b]ecause the applicability of the Sixth Amendment to

13  this type of case is unsettled...we adopt a due process analysis for purposes of this case").

14  Accordingly, the California Supreme Court's denial of Petitioner's compulsory process claim was

15  not objectively unreasonable.

16               **3. Due Process Claim**

17       The right of an accused in a criminal trial to due process is, in essence, the right to a fair

18  opportunity to defend against the State's accusations.  Chambers v. Mississippi, 410 U.S. 284, 294

19  (1973).  A defendant's right to present evidence in her defense is not unlimited, however.  Clark v.

20  Arizona, 548 U.S. 735, 770 (2006).  State rules of evidence may curtail a defendant's right to

21  introduce relevant evidence provided such rules serve a legitimate purpose and are not

22  disproportionate to the ends they seek to promote.  Id.  The Ninth Circuit has concluded that

23  California Evidence Code sections 1043 and 1045 do not violate a defendant's due process rights

24  where the defendant fails to make the showing of materiality required by California law.  See

25  Harrison, 316 F.3d at 1063.[9]  Petitioner's contention that he was denied his due process right to a fair

26

27  [9] The precise provision at issue in Harrison was the five-year cut-off for impeachment material entailed in sections 1045 and 1043, which prohibits discovery of complaints against officers that are more than five years old.  While the appeal in Harrison

28  was pending, the California Supreme Court held in City of Los Angeles that despite the statutory cut-off, complaints against officers are subject to disclosure if they are "exculpatory," regardless of the age of the complaints. 52 P.3d at 137.  The Ninth

1   trial cannot prevail, as the Court may not disturb the California Court of Appeal's determination that

2   Petitioner failed to make the required showing of materiality necessary to obtain the Pitchess

3   materials.  See Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied, 537 U.S. 859 (2002)

4   (federal habeas courts bound by state court determinations of state law questions.)  Therefore, the

5   California Supreme Court's denial of Petitioner's due process claim was not objectively

6   unreasonable.

7              **B.      Exclusion of Hearsay Testimony**

8              Petitioner contends that the trial court's exclusion of Bermudez's testimony – that

9   prosecution witness Figueroa was a good forger – deprived him of his Sixth and Fourteenth

10  Amendment right to a fair trial.  At trial, Petitioner argued that Bermudez's testimony was relevant

11  to support the defense's theory that someone other than Petitioner, possibly Figueroa, authored the

12  kites used as evidence against Petitioner.  On appeal, Petitioner also argued that evidence of

13  Figueroa's reputation as a good forger was also relevant to attack Figueroa's credibility and character

14  for truthfulness.  The California Court of Appeal evaluated Petitioner's claim of error solely as a

15  state-law evidentiary matter and held that Bermudez's testimony was inadmissible hearsay.  The

16  California Supreme Court summarily denied Petitioner's claim, and thus the Court must conduct an

17  independent review of the record and determine whether the California Supreme Court's summary

18  denial of Petitioner's federal constitutional claims was objectively unreasonable.  See, e.g.,

19  Musladin, 555 F.3d at 835.

20             "The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf

21  have long been recognized as essential to due process."  Chambers, 410 U.S. at 308.  "Few rights are

22  more fundamental than that of an accused to present witnesses in his own defense," however, in

23  exercising this right, the accused must comply with the state's established rules of procedure and

24  evidence.  Id. at 302.  "Although perhaps no rule of evidence has been more respected or more

25

26  _____

27  Circuit then held that because, as interpreted by the California Supreme Court, California Evidence Code section 1043 and 1045 complied with due process requirements as stated in Brady and Ritchie (state may not prevent disclosure of "exculpatory" information), the statutory five-year cut-off does not violate due process.  *A fortiori,* the remainder of sections

28  1043 and 1045, which permit the discovery of information less than five years old even when such information is not "exculpatory," cannot violate due process.

1   frequently applied in jury trials than that applicable to the exclusion of hearsay...where constitutional

2   rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied

3   mechanistically to defeat the ends of justice." Id. at 303.  Where otherwise inadmissible hearsay

4   evidence bears "persuasive assurances of trustworthiness" and is "critical" to an accused's defense,

5   exclusion of such evidence may violate a defendants due process right to a fair trial.  See id. at 302-

6   03; see also Green v. Georgia,442 U.S. 95, 97 (1979).

7        The exclusion of Bermudez's testimony did not violate Petitioner's due process right to a fair

8   trial.   Unlike the statements at issue in cases such as Chambers and Green, which were supported by

9   the basic rationale regarding statements against interest as well as corroborating evidence on the

10  record, Bermudez testimony bears no "persuasive assurances of trustworthiness." See Chambers,

11  410 U.S. at 312; Green, 442 U.S. at 96-97.  In an offer of proof outside the jury's presence,

12  Bermudez testified that "probably about three dudes" told him that Figueroa could forge documents.

13  (Pet.; Ex. A at 12-13).  Bermudez had no personal knowledge of Figueroa's abilities, no knowledge

14  of the facts underlying the hearsay statements made to him by the three individuals, and no evidence

15  on the record corroborates Bermudez's testimony.  Further, the Court cannot say that Bermudez's

16  testimony was "critical" to Petitioner's defense.  Petitioner remained free to cross-examine Figueroa

17  regarding his alleged forging abilities, call other witnesses with personal knowledge of Figueroa's

18  skills, and present evidence regarding discrepancies between Petitioner's handwriting and the

19  handwriting in the kites.  Accordingly, the California Supreme Court's rejection of Petitioner's

20  hearsay-based claim was not objectively unreasonable.

21        **C.        Ineffective Assistance of Counsel Claims**

22        Petitioner contends that his trial counsel's failure to renew the Pitchess motion constituted

23  ineffective assistance of counsel.  Petitioner also contends that he was denied effective assistance of

24  appellate counsel due to the fact that his appellate counsel did not properly assert federal claims

25  during Petitioner's direct appeal from his conviction.  Petitioner raised his ineffective assistance of

26  counsel claims for the first time in his state habeas petition, which the California Supreme Court

27  summarily denied.  While a state court's summary denial is considered to be on the merits, see

28  Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992), because there is no "reasoned" state court

decision with respect to Petitioner's ineffective assistance of counsel claim, the Court must conduct an "independent review of the record." See, e.g., Musladin, 555 F.3d at 835.  Although the Court must independently review the record, the Court still defers to the state court's ultimate decision and may only grant relief where the state court "clearly erred" in its application of federal law.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

For Petitioner to prevail on his ineffective assistance of counsel claims, he must show: (1) that counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  A court evaluating an ineffective assistance of counsel claim does not need to address both components of the test if the petitioner cannot sufficiently prove one of them.  Id. at 697; Thomas v. Borg, 159 F.3d 1147, 1151-52 (9th Cir. 1998).  Establishing counsel's deficient performance does not warrant setting aside the judgment if the error had no effect on the judgment.  Seidel v. Merkle, 146 F.3d 750, 757 (9th Cir. 1998).  A petitioner must show prejudice such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.

The Court need not determine whether counsel's performances were deficient under the onerous Strickland standard, because Petitioner cannot possibly demonstrate any prejudice resulting from the alleged deficient performances of his trial counsel and appellate counsel.  Where, as here, the non-existence of evidence renders it impossible for a petitioner to establish that he was prejudiced by counsel's alleged deficient performance, a federal habeas court may not grant relief. See Grisby v. Blodgett, 130 F.3d 365, 372-373 (9th Cir. 1997); see also Hendricks v. Calderon, 70 F.3d 1032, 1042 (9th Cir. 1995) (absent an account of what beneficial evidence investigation into issues would have turned up, petitioner could not meet the prejudice prong of the Strickland test).  In Grisby, the petitioner asserted an ineffective assistance of counsel claim based on his counsel's failure to pursue testing of a piece of carpet from the crime scene.  The petitioner argued that a test of the carpet might have exculpated him by showing that his blood was not present at the scene of the crime, making it unlikely that petitioner was the victim's assailant.  By the time the petitioner in Grisby filed his federal habeas petition, the carpet had been destroyed.

1   The Ninth Circuit rejected the petitioner's ineffective assistance of counsel claim, noting that it

2   would be impossible for the petitioner to establish prejudice due to the carpet's destruction. <u>Grisby</u>,

3   130 F.3d at 372-373.

4           Like the petitioner in <u>Grisby</u>, Petitioner cannot establish that he was prejudiced by his

5   counsel's alleged deficient performance because the evidence needed to establish prejudice no longer

6   exists.  Petitioner avers that had his trial counsel renewed the Pitchess motion, Petitioner would have

7   been granted discovery of officers Roper and Montgomery's personnel files, which might have

8   assisted his defense.  Petitioner speculates that the Pitchess materials may have contained evidence

9   that officers Roper and Montgomery had forged kites in the past, which would in turn have

10  supported Petitioner's defense theory that the kites used to convict him were forgeries.  At this point

11  in time, however, the Court cannot determine whether obtaining the Pitchess materials would have

12  been of any assistance to Petitioner's defense at trial, as the records no longer exist.  Similarly, there

13  is no way of knowing whether Petitioner's appellate counsel would have obtained a different result

14  had counsel properly asserted federal claims during Petitioner's direct appeal of his conviction.

15  Appellate counsel could only have prevailed on Petitioner's Strickland claim by demonstrating that

16  the Pitchess records would have assisted Petitioner's defense.  Accordingly, the Court cannot

17  determine whether Petitioner was prejudiced by his appellate counsel's performance without

18  ascertaining the contents of the Pitchess materials.  Because the Pitchess materials no longer exist,

19  Petitioner cannot satisfy his evidentiary burden with respect to establishing prejudice resulting from

20  the alleged deficient performance of his trial counsel and appellate counsel.  Therefore, the Court

21  may not grant him relief.

22          The Court also notes that, in light of the evidence presented at Petitioner's trial, it is highly

23  unlikely that any evidence uncovered by a successful Pitchess motion would have changed the

24  outcome of the proceeding. With respect to Petitioner's conviction for soliciting the murder of

25  Steven Ray Gonzalez, the prosecution's evidence established a complete chain of custody over the

26  operative kite that renders Petitioner's theory that the kite was forged by a correctional officer simply

27  unbelievable given the evidence proffered by the defense.  In order for Petitioner to convince the jury

28  that either Roper or Montgomery forged the kite ordering the killing of Steven Gonzales, Petitioner

1   would have had to assert that one of the officers forged the kite and gave it to Munoz before Munoz

2   was assaulted.  This theory  would have directly contradicted Munoz's testimony, offered by the

3   defense, that Munoz himself forged the kite out of animosity towards Petitioner.  Further, the

4   prosecution proffered testimony of an expert handwriting analyst who concluded that the kite found

5   in Munoz's mouth could only have been authored by Petitioner.  It is clear from the verdict that the

6   jury credited the testimony of the prosecutions's expert over the direct testimony of Munoz that he

7   had forged the kite himself.  Thus, it is highly unlikely that the jury would have been swayed by

8   evidence obtained through Petitioner's Pitchess motion, which, even if it existed and was found to be

9   admissible, could not have been used as *direct* evidence that either Roper or Montgomery forged the

10  kite in question.  See CAL. EVID. CODE § 1101 (a) ("evidence of a person's character or a trait of his

11  or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific

12  instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a

13  specified occasion"). With respect to Petitioner's conviction for soliciting the murder of Ray

14  Martinez and Alfredo Martinez, Petitioner's forgery theory would have had to overcome not only the

15  handwriting analyst's expert testimony but also the direct testimony of Daniel Figueroa, who stated

16  that Petitioner orally confirmed the orders to kill Ray and Alfredo Martinez in the exercise yard.

17         In light of the fact that the evidence required for Petitioner to establish prejudice does not

18  exist, and given the current evidence contained in the record, Petitioner cannot demonstrate that he

19  was prejudiced by his counsel's alleged deficient performance.  Accordingly, the California Supreme

20  Court's denial of Petitioner's ineffective assistance of counsel claims was not objectively

21  unreasonable.

22  **V.      Certificate of Appealability**

23         A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

24  district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-

25  El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue

26  a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

27         (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district
           judge, the final order shall be subject to review, on appeal, by the court of appeals for
28         the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

///

///

///

///

///

1

## <u>ORDER</u>

2     Accordingly, IT IS HEREBY ORDERED that:

3     1. The Court's April 8, 2009 production order is DISCHARGED;

4     2. Respondent's Request for Relent and Reconsideration is DENIED as moot;

5     3. The Petition for Writ of Habeas Corpus is DENIED with prejudice;

6     4. The Clerk of Court is DIRECTED to enter judgment; and

7     5. The Court DECLINES to issue a certificate of appealability.

8

9

10 IT IS SO ORDERED.

11 **Dated:**    **June 15, 2009**            **/s/ John M. Dixon**

12                    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28